Oyez, Oyez, all persons having business with the Honorable United States Court of Appeals of the Third Circuit, are advised to join me in congratulating the Court that is now in session for God Save the United States, and this Honorable Court will please be seated. Good afternoon. Good afternoon. Good afternoon. I'd like to thank you also for the schedule of accommodations. If you recall, I was actually still in sunny Syracuse, and the storm that hit us here was such that we didn't want to try to dodge the meteorological bullets you'd have to have had to commit, so thank you very much for that. First defendant, Lupo v. Loan City, Mr. Coughlin. Yes, Your Honor. Good afternoon, Your Honors. Good afternoon. My name is Michael Coughlin. I represent the appellant at the leading Stewart Title Guarantee Company. I would like to reserve three minutes for rebuttal, if I may. The Stewart Title Appeal involves a case of first impression in Pennsylvania, and that is whether the in-for-one, in-for-all defense doctrine applicable in cases of general liability insurance also applies in the case of title insurance. When the title insurance policy at issue specifically limits the duty to defend to covered claims only. You're not alleging that the potential problem with title arose as to counts one and counts two as well. You're looking only at counts, I understand this is count three, so maybe count three, but basically it's count four that you're alleging was the first count to allege it. Yes. In Mr. Lupin's fourth amended complaint, there are three counts, count one, count two, and then a count four. There's no count three. Okay. We're alleging that the district court found that we were responsible. We had a duty to defend count four, and in fact, we recognize that duty in appointing counsel to represent us. But you're not alleging that there's any arguable defect in titles that might trigger your title insurance policy under the traditional concept of coverage as to the allegations in count one or count two. That's correct. And I can address that. I was going to address that a bit later, but I can address that now. I just wanted to clarify that. Because this is a case of first impression in Pennsylvania, and it's a matter of significant public importance not only to title underwriters but to insurers, we've also filed a motion requesting this court to certify the issue to the Pennsylvania Supreme Court pursuant to Local Rule 110.0. What would you rather, an opinion from us or certification of Pennsylvania? We can go and take it personally. With all due respect, Your Honor, I'd rather have a decision from the Supreme Court because that will be binding on the Pennsylvania's courts, and quiet title actions are almost always brought in the Pennsylvania courts. So although a decision from this court would be certainly very persuasive, it would be binding on the courts if it came from the Pennsylvania Supreme Court. The title policy at issue in this case is one that was approved by the Pennsylvania Department of Insurance. It's used by all title underwriters in the state of Pennsylvania. And Section 4 of the title policy clearly and unambiguously provides that the steward title had a duty to defend, quote, only those stated causes of action alleging a default, lien, or encumbrance, or other matter insured against by this policy. I thought, unfortunately, the appendix copy of the title insurance policy is hard to read. I thought 3C, I don't remember seeing this in the title policy before, but it also insures against defects subsequent to the taking and purchase. Is that right? Not just defects at the time of the acquisition, but it insures against defects subsequent to the time. There are certain matters that are insured against that are subsequent. Most of the time, title policies cover defects in existence at the time of the policy. This particular policy is a newer version. There are certain stated items. For example, forged assignments of mortgage. That would be something that's post-policy, but is nevertheless covered. Stemming from what, WAMU and all that stuff? Pardon me? Washington Mutual bankruptcy. Forget it. There were a lot of cases post-2008 where entities were discovered to have assigned them by robo-signing, etc. Yes, you're correct on that. I got it. Does that make it more like a general liability policy for purposes of the complete insurance? No, because what I just recited to Your Honor is one of a handful of exceptions that apply to post-policy events. The overwhelming majority of risks that a title company assumes relate to risk at the time of the government, which is an extreme argument in terms of the uniqueness of title insurance. Some of what is so unique is the nature of the limited scope of risk. It's risk that you're insured against as of the time the title passes. Any defect that might compromise or negate title is insured against. So you're only looking back to the past. Correct. And therefore, it's very different from general liability where you're looking to insure risks that may occur in the future. I'll give you another example that is covered under the title insurance policy, mechanics liens. Mechanics liens relate to work performed prior to the policy, but it sometimes don't come into fruition until afterwards. So there are a handful of very limited risks that the title companies are willing to assume post-policy, but the overwhelming risks that are assumed relate to matters in effect at the time of the policy. That's why you do a title search of the property. That's why you try to take care of as many of those risks at the time, such as paying off prior mortgages. You do investigation for mechanics liens, those types of things in an effort to minimize your risk because a title policy is a – it insures as of the date of policy. With those few exceptions that we talked about, it doesn't cover post-policy events. There's a limited – it's a one-time premium. So you pay one-time premium and you get lifetime coverage so long as the insured maintains an interest in the property, either the mortgage holder has a mortgage against the property or the owner. So it's a limited risk that's assumed. It's a one-time premium as compared to general liability insurance, which is you pay continuing premiums on a going-forward basis for stated periods of time because you're covering future risks, those undetermined future risks. What do you do with the Pennsylvania Supreme Court's broad statement saying the title insurance policies generally are governed by the same concepts of contract law that apply to all policies? I think you're referring to the Root case. And in the Root case, the court held, I think specifically, that they're subject to the same rules of interpretation as general types of insurance. For example, the court held in that case that it dealt with a septic system on a property. But the general holding in that case was that title policies are subject to the same rules of construction as other types of insurance. So then why don't we limit our inquiry to the four corners of the policy? Look at what is insuring limited to that? One of the rules of construction for all insurance policies is that in the absence of an ambiguity in the policy, if you have clear and unambiguous language, the court must give effect to that language. This court has held that. The Pennsylvania Supreme Court has held that. I'm talking about the Urban Outfitters case in terms of this case and the Donovo case, which is the Pennsylvania Supreme Court. Where is the ambiguity here? Pardon me? Where is the ambiguity here? There is no ambiguity here. That's our position, Your Honor, that Section 4, the duty to defend language, is unambiguous and it states that the title company, and I'm paraphrasing, the title company is only obligated to defend covered claims. So in the face of that clear and unambiguous language, what the district court did was invoke the public policy exception and the public policy exception has never been applied in the context of title insurance. It's never been applied in a situation that we could find where the title policy at issue expressly stated, contrary to what the court claimed was the public policy. So in this particular case, although the district court invoked public policy, that public policy, if it in fact is the public policy of Pennsylvania, only applies in general liability insurance. It's never been applied in a title insurance case. And it's never been applied in a situation like this where you have an insurance policy which specifically states to the contrary of what the district court held. So I think the court improperly invoked the public policy exception in this case and should have abided by the clear and unambiguous language. What was the public policy? I guess it's one in for one and for all? Yeah, the district court held that the public policy of Pennsylvania was that in for one and for all applied to all insurance policies. And respectfully, I think that's incorrect because we never had a case applying it to title insurance. And for the reasons set forth in the GMAC case and the Seventh Circuit's decision in Philadelphia indemnity, title insurance is fundamentally different than other types of insurance. So in those two cases, did those policies also have exceptions for future risk? You've identified a couple of exceptions in this policy for future risk. It makes it more analogous to the traditional insurance. Those policies would have had an exception in for mechanics length because mechanics length exception has been in place for a while. I'm not sure whether it was the type of policy at issue in this case specifically covering forwards assignments of mortgage. But there certainly would have been a risk such as mechanics length, which is a post-policy risk. But there's a difference between accepting out specifically mechanics length. And on the one hand, as opposed to saying it will insure against future risk. No, I'm saying they would have insured claims for mechanics lengths even though it was a post-policy event. Right. I'm trying to do the same thing. We will also insure things for mechanics lengths on the one hand as opposed to on the other side. And we will also insure subsequent claims that arise that impact your title and not limit it to mechanics lengths. Correct. I mean, there's certainly a difference between an insuring provision and an exception. But in those cases, I think the analysis is analogous to what we have here, and that is the court was analyzing whether title insurance, that the informal doctrine should apply to title insurance. One of the big key distinctions that was pointed out by the Seventh Circuit in Philadelphia indemnity is that general liability insurance typically requires the insurer to defend a suit. It's got a general statement, a suit, within the event of an occurrence or an event has been alleged in connection with that suit. So the rationale behind the infer one, infer all doctrine is that if an insurer has agreed to defend a suit, then the insurer should be on the hook for defending the entire suit. All claims asserted until such time as it's narrowed to an uncovered claim. The language of a title policy is significantly different. It talks about claims that the insurer undertakes to defend the insurance against claims alleging a defect in title. So the scope of the duty to identify and the scope of the duty to defend is much more limited in a title insurance policy than in a general liability insurance policy. Another key issue that the court in both GMAC and Philadelphia indemnity pointed out is that you don't have the issue of parsing of multiple claims that you have in general liability cases. General liability cases you may have a defective product. You've got breach of warranty claims. You've got negligence claims. You've got strict liability claims, which are all similar in nature. In title insurance... It does use the term claims and suggested that that would be within the scope of coverage, whereas a few minutes ago you tried to say some claims and suits. What I'm saying here is it makes sense in the context of general liability insurance because one of the rationales for the in-for-one, in-for-all doctrine is that, at least in the case of general liability insurance, it's difficult to parse out covered and non-covered claims because they're so related. For example, you have negligence, strict liability, breach of warranty, all related to the failure of a product, let's say. Title insurance claims are far different. I've been handling title insurance litigation for almost 30 years. Typically, what you see is... He doesn't want to sit with me. It's so boring. Not if you're a transactional lawyer. He's just speaking for himself. Typically, what you'll see is, for example, in a mortgage foreclosure action, the borrower will allege various counterclaims against the bank. One will be for lender liability. One will be for breach of RESPA, truth in lending claims, and then you'll have a forgery claim. In that situation, separating the title-related claims, the forgery claims, from the non-title-related claims is very easy. Unlike general liability where the claims aren't discrete, in the title insurance context, they are. It's very easily done. Again, I've been doing it for a long time, and I frequently come into a case as co-counsel for a lender's counsel, and I handle the title-related claims, for example, a forgery claim and a foreclosure action, and then I work with co-counsel, and he or she will defend the foreclosure aspects of the case. What about the legal expectation of the insured, which isn't really focused much on the breach, but that's part of the traditional canons of interpretation? You're suggesting that somebody who buys the title insurance, insurance title, insurance policy, will expect that the insurer of the title will include anything at all as long as there's a claim asserted against that purchaser that implicates title, which I would suggest you assume that. Number one, the reasonable expectations doctrine, you can't invoke the reasonable expectations doctrine to vitiate a clear and unambiguous provision in a insurance policy. But respectfully, with respect to the reasonable expectations of an insured, is it reasonable for an insured to expect that a title insurance company will defend the insured against lender liability claims that arise after the policy is issued? Respectfully, I don't think that's a reasonable expectation. Similarly, RESPA violations, truth in lending violations, those types of things, I don't think the ordinary insured is expecting the title company to step up to the plate and defend the insured as to those claims. Now, a title claim, a forgery claim, I think certainly the insured would expect the title company to step up to the plate and defend that type of claim. Because it affects title. Pardon me? Because it affects title. It affects title. Yes, it affects title, yes. So respectfully, I don't think the reasonable expectations doctrine is a basis to overturn the clear and unambiguous duty to defend language in the policy. Do you know of any case in America where a state supreme court has held as the district court did here? No. There is one other case that I'm aware of. It's the Little Italy case that was cited by Aquin in his brief. It's a case out of the Northern District of Ohio that the court ruled as did the district court here, but then that opinion was vacated upon motion later. So every court to address the issue that I'm aware of, the GMAC court, which was a certified question before the Massachusetts Supreme Court. And then the Seventh Circuit. And then the Seventh Circuit and Philadelphia Indemnity. They're the only two courts that have addressed the issue. So if we affirm here, we create a circuit split. Correct. Okay. Thank you. Did you say something about them? Yes, I did, Your Honor. Okay. So we'll hear from you again. Okay. Thank you. Good afternoon, Your Honors. Very pleased to court. My name is Brett Messinger, and I represent the Aquin Loan Servicing Fish Cost Appeals, as we all know. I'm going to ask you the same question I asked your opposing counsel. Do you know of any case in America that's gone the same way, any state Supreme Court that's gone the same way as the district court did here? No, I don't. I mean, the problem is that you've got a Pennsylvania Supreme Court case called Cabriner, which basically says look at the four corners. And title insurance, which I used to do a lot of this back in the transactional world, is liability insurance is going forward. If something happens tomorrow or next year, as long as you're paying your premium and it's within the coverage of the policy, it's there. Title insurance is a look back. Yeah, I think, you know, there was a distinction that was made in the one circuit court in regard to how we're to view title insurance. But this policy that we're talking about is a little bit of a hybrid, too, and I think Judge McKee actually talked about that, is typically when you look at a title policy, it is a snapshot. And that's one of the things that one of the circuits actually did talk about in regard to the differences in title policies. This policy isn't the same policy that steward title is worried about that's being issued to everybody. And that's why we kind of emphasize also in our briefs in regard that this is a gold comprehensive policy. It's more like, as you pointed out, this policy is more like a liability policy. What makes it more like that? The reason for it is, so counsel had talked about the mechanics lien. The mechanics lien isn't really different. A mechanics lien is still a lien that exists as of the date of the policy's issue. The reason why it's different is because you actually don't have to file that in the public record until within a certain time after the work's performed. So anybody who's actually gone and had a house closed, and one of the affidavits that the seller actually executes is to certify that no work had been done on that house for a certain period of time because those are the only liens that actually don't have to be filed in the public record. But the reason why this policy is a little bit different is, and we kind of put it out in our briefs, is that there's all sorts of a myriad of different things that could occur after the policy date. So when you make the distinction between title policies and other types of policy, typically when you see the type of title policies that are issued, they actually are a snapshot in time in regard to the specific types of losses that we're talking about. But this policy is different. When you look at the policy, and I know that in the reproduced record, there is sort of a fuzzy copy of the policy, which is why we supplemented the record afterwards and attached to our opening brief a more clear copy of the policy that you can see. But you also see like this little symbol that Stewards uses in regard to what they call enhanced policy. And if you look at each of the parts in which that little symbol goes to, it actually gives things that could occur after the time of the policy. And then there's another provision in the policy. It says, notwithstanding any of the limitations by this language, there's other things that might cause coverage to happen after the policy's issuance date. So in regard to whether this is the policy that we're worried about that's going to affect every single thing that ever happens for the life of Pennsylvania, that's not true. This policy is very different. What you're asking is to say that a title insurance policy for which you pay premium one time and it's modest is going to have into the future the same kind of coverage as significant general liability policies that are renewed annually or semi-annually. Yeah, I mean, it goes back to what you were saying. That sends one heck of a bad message throughout the title insurance industry. Well, one of the things that we know is we call it a modest premium because it's low in price, but we also know that the risks that usually happen are not significant. All the premiums are approved also by the Department of Insurance, and I guarantee you that the big buildings that all these title underwriters are building isn't because they're not making any money. So even though, I mean, the risk that it actually insures against isn't that great. If I recall, title insurance is based on the value of the property that's being sold. Yeah, it's two things. In our policy it would be based upon the amount of the mortgage amount, and then the owner's policy, which is a different policy, is actually based upon the value of the property. So in this case, Lupu asserts for the first time in response to interrogatories that Loan City falsified the original mortgage documents. So this is not an assignment issue like you see in the cases post-2008, and you've got a policy that's very clear in what it covers. How can we expand the literal words of that policy? You actually don't have to expand it. And before you even reach the issue, and I would state that you don't even need to reach the issue whether or not the complete and full defense doctrine or rule actually applies here, because when we look at the Fourth Amendment amended complaint, at the time that we submitted a claim prior to the time that a decision regarding coverage was actually made, we all knew what Lupu was arguing. When you look at the – there's a lot of things that are clear in regard to the common allegations in regard to each of the three counts that are contained in the Fourth Amendment complaint. We know, for example, that Lupu is challenging the validity of the mortgage, the enforceability of the mortgage, and a clear reading of what he's trying to allege. And remember, it's not a great – it's not the best drafted complaint ever. But what we can tell from looking at the complaint itself, just the complaint, just the four corners of the complaint, is that he's trying to avoid the mortgage. And what he's saying in regard to the assignments is because the mortgage wasn't valid in the first instance, and that goes to the notarization and the way it was executed at the time, none of the assignments to that mortgage can be valid too. So what he's saying is that those – he's using the word forgery, but it's clear from what his general allegations are in the Fourth Amendment complaint that what he's saying is the assignments can't be valid because the original mortgage wasn't valid, and it wasn't valid because it wasn't executed correctly. And that goes through the whole theme of the complaint. When you look at the common allegations in regard to the Fourth Amendment complaint, it makes it very plain. And if it's not plain, we know by that time that we have answers to the robberies. This is before Stewart makes his coverage decision. We have a court – we have the district court putting in the footnote. The only thing that they actually really discuss in regard to the decision in the case is in the footnote it says, it says the real issue in this case is whether or not the mortgage is properly enforceable because of the execution part. So when we submit that to Stewart Title, when we know that that's the theme running through the entire Fourth Amendment complaint, and for it to then revert back to just what the plain language of the complaint is, that doesn't make any sense. Typically when you present a claim to an insurance company, usually you don't have first, second, third, fourth complaints. You usually just have a complaint. And the only information that they have available in regard to making a determination as to whether or not the policy would respond to that is by looking at just the complaint. But here, and in the Heffnan case, we know that the court can look outside the four quarters. The four quarters is basically the typical thing. And in that case, we actually have answers to interrogatories. And what's important is, is in the Kverner case, the reason why the extrinsic evidence was being used was in order to show that the determination by the coverage determination was incorrect. By the time that that expert report in Kverner was actually already produced, a coverage decision had already been made, and the extrinsic evidence was just to determine whether or not they should have decided it some other way. In the Heffnan case, it's really our case, where you have a court's opinion, you have what I think is clear language in regard to the Fourth Amendment complaint, showing that the theme about what the case is about is the enforceability of the mortgage. And that's in Count 1, Count 2, and Count 4, and it actually incorporates all the common allegations throughout the theme of the complaint. What is different in Count 4? Somehow it wasn't signed in front of a notary, or was it signed in front of the wrong notary? Yes, so basically what the allegations are, and it's actually in the common allegations, is that Mr. Lupu says that he signed it in front of a notary from a specific county, but the document that actually found its way to the recorder's of deeds office was notarized in a different county, I think even in a different state. So you're telling me that the Infor1, InforAll applies to somebody, the fourth time around says, I had a notary from the wrong county? Well, actually what I was trying to tell you is that you don't even need to reach that. And in regard to Infor1 and InforAll, I don't think you need to reach it because I think the Fourth Amendment complaint actually shows that coverage should have been allowed for the entire time. But the district court went off on the Infor1, InforAll general public policy this year. That's right. So then if we just kind of focus on what the complete defense rule is, is that, you know, is there really a difference? You know, when we look at provisions in regard to providing a defense, which is different than whether or not something is covered or not. It's a broader type of thing. And then if we look at all the cases that actually have addressed the doctrine, the Infor1, InforAll doctrine, we don't see any distinctions between any types of policies in regard to, we have other cases that actually say that title policies are basically to be constructed the same way as other types of policy. So when you have that and you have that from appellate level courts, it seems that when they make those decisions, they're not even reverting back to see what the language of the policy themselves actually say. It's the public policy of Pennsylvania that when you see, when you have a duty to defend, you're supposed to defend all the counts into the complaint until it clearly doesn't implicate coverage for any of the counts. Is your practice primarily real estate? What's that? Is your practice primarily real estate? Unfortunately, yes. Like Mr. Coughlin. I never disparage it. Don't get me wrong. Okay. Like Mr. Coughlin, I do a fair amount of title claims. I very frequently, on the other side of underwriters, like Stewart Title. Yeah, usually I would think so. The way it's normally done is you look at the title companies that are around, and you have a project or whatever, especially on bigger buildings, and you want to try to get the lowest amount possible if you can. Not in Pennsylvania. Not in Pennsylvania. So in Pennsylvania, that might be usually. In Delaware, people have relationships with firms and whatnot. Yeah, so basically what it is is just in regard to premiums for, I don't know anything about stuff outside residential. I don't do stuff outside residential mortgages often. But all the rates are actually approved, and it doesn't matter which underwriter actually issues the policy. They're all approved rates, and you get the same thing from anybody. You can go to Stewart. You can go to Fidelity. You can go to Old Republic. You're going to get the same premium. We always said you're only as good as the person who does the search. Well, that's true. That's true. So just in regard, when we look at, you know, when we're trying to figure out what the public policy is, is that we do look at the precedent that has been in existence in this jurisdiction forever. And all that precedent actually does, without revert really to the policy language, it says, hey, if you're going to provide coverage for one, you should provide it for all. And the reason for that is, and we've had this in this case, is it's difficult to pro-rate as to what type of, you know, how much of the non-covered attorney's time. And that makes sense in a liability policy, general liability, when you're paying an annual premium. Yeah, but I will tell you from personal experience, I oftentimes, in this case as well, you know, it actually does increase the cost because, you know, we're running things by the other counsel. They're running things by us. We're trying to make sure who writes what part of the briefs and all that type of stuff. And in the end, what it actually does is it makes a lot of duplicative effort. And I think that when we read the cases, that's part of it. And we have some cases that kind of talk about the difficulties in pro-rating it, because it's always one case. You're asking us to do something that is different from what the Massachusetts Supreme Court has done and different than what the Seventh Circuit has done. Yeah. And so why is the reasoning of those, and those are pretty comprehensive opinions, why is the reasoning in those opinions wrong? Well, in a couple other cases, which we've also cited in there, the Little Italy case that we talked about, even though it's a district court case. It got vacated. Well, it got vacated differently than it just said. Yeah, I get it. So it got vacated because the question was certified to the Supreme Court, and then the case seemed that it settled, and therefore they vacated for certification, but then the certification never happened. But that doesn't take away from the reasoning. And you also had mentioned about the split in the circuits. There isn't a split in the circuits, because Pennsylvania law can't, there's no Pennsylvania law being decided by another circuit, so it's not like we're doing something that's not. Well, it invites us to say what the Pennsylvania Supreme Court would do. Yeah. And it's usually fairly easily done. We don't certify that many cases unless it's something that we're really uncertain about or it's such a significant matter of public policy. Judge McKee and I had one dealing with whether Pennsylvania would follow the restatement second or the restatement third of torts. It's a very significant issue, and we let the Pennsylvania Supreme Court have the first shot at it. So what did they do? They just sent it back and decided they wouldn't decide it. Go figure. Yeah, I see that I'm out of time, but can I make one final statement? Go ahead. So, and I know we're the only case here, right? But just in regard to, so you certify this question, well, you should have, you know, it's not conclusive that they're actually going to decide that issue because it's quite possible, and I think likely, that they may look at this and say, all three of the counts were covered claims anyway. So it may not be the issue. Can you elaborate on that, your position that one and two are also covered claims and you have to get to this issue? Yeah. And the reason for it is because if you look at all the common allegations that start out in the fourth complaint, I know you guys will look at it, but if you look at all that stuff, it incorporates it into each of the counts. Count one is that the money damages entry to fall to the ground at Lone City did not timely answer. Count two alleged that the assignments of the mortgage were voidable because of the MERS system. That one's not going to fly too well, most likely. Three, third is defendant's failure to disclose their intent to securitize was fraudulent. I mean, that's fairly different than You know, when we look at the common allegations that lead into each of those counts, we're talking about the deed that was signed at the time of the closing, that's the one that went into the record. We also have the benefit also of the court actually telling us what they saw as the real issue. And with answers to interrogatories, it said exactly what it is that we're saying. There was nothing else in the complaint that really needed to be decided. But you take those three, and then all of a sudden, out of the blue, comes the fourth amended complaint saying this was the mortgage document was signed before the wrong notary? Yeah, so I think what he meant by that is that the one that was filed was not signed, was not the one he actually signed before the wrong notary. The one that was signed was Merlin, apparently. Exactly. All right, I have no further questions. Thank you. Thank you, Your Honor. I'll try not to rehash any ground we've covered. I think we were merging Lupu's third amended complaint and the fourth amended complaint a bit. In the third amended complaint, he alleged the default judgment against Loan City, the MERS, not a mortgagee and a violation of local statutes. Both counts to be true related to the validity of the MERS system and Lupu's contention that you can't assign a mortgage without assigning the underlying promissory note at the same time. So he's attacking the validity of the MERS system. And what was the limiting language, actually, in the mortgage policy? I'm sorry? In title insurance policy. What was the limiting language as to what is covered? What is the policy of the Four Corners? Does it say we cover? We cover forged assignments of mortgage and the unmarketability and validity of the insured mortgage. So forged assignments and the invalidity of the mortgage. In the third amended complaint, he was only attacking the assignment to One West, which was the predecessor to AQUA. So there was no allegation in the third amended complaint that it was forged, the mortgage was invalid as a result of that. He was claiming that the... This has gone through two assignments. Right. One city to One West and then One West to AQUIN. We denied coverage on that and we sent emails to AQUIN's counsel saying, based on our review of the complaint, it looks like he's complaining about the securitization of the mortgage and not necessarily that the assignment is forged. And in fact, wasn't there like a November 2013 email... Yes. ...that said that the third amended complaint contains no covered claims? Correct. Or acknowledges that. But then at that point, they raised the issue, well, he said in response to interrogatories and in response to a motion for summary judgment that his signature on the mortgage was forged. That was the first time he had claimed his signature was forged on the recorded mortgage. And under Kvarner, those extrinsic evidence, those subsequent filings, clearly are not to be considered in terms of the duty to defend. Kvarner is very clear that the duty to defend is determined solely from the allegations of the complaint. And this court has followed Kvarner several times since it was decided in 2006, basically holding you don't consider extrinsic evidence. So the lower court properly disregarded that. But in response, the district court also issued an order denying a motion to dismiss that I filed. But in it, it said that it appears from Lupu's subsequent filings that he is seeking constructive amendment of his third amended complaint. So then that led to the fourth amended complaint. And in the fourth amended complaint, he alleged the default judgment against Long City. Count two related to that the assignment was invalid because of the invalidity of the merge system. And then count four, which was the last one, the one that we did accept coverage for, that's the one that it was entitled fraud by deception and quiet title. The distinction between those three claims is in count one and count two, Lupu sought monetary damages only. With respect to the default judgment and the attack on the assignment, in the warfare clause, he only sought money damages. That's critical from a coverage determination because we only cover claims seeking the invalidity of the mortgage or the assignment. In count four, the one we did accept, in the warfare clause, he asked for a judgment quoting a wording plaintiff in order to quiet title and final judgment that the defendants and their successors and signs be forever barred from asserting any right, title, lien, or interest in the land inconsistent with the interest of plaintiff. That relief was not found in count one and count two. So it was for that reason we appointed counsel to represent Ocwen with respect to count four but denied coverage as to counts one and two. Let's go into the relief. If I buy a property, a real estate, and find out that the seller didn't have the title of the self-made, and I don't want a specific performance or anything like that, I just want dollar damages because I found a better lot, but it's going to cost me more than I want. I sue for the due diligence clause. Let me sue you for damages. That doesn't go to the fact that I'm alleging a defect in title. With respect to duty to defend that lawsuit, the duty to defend would not arise as to that particular lawsuit. The title underwriter would still have a duty to indemnify the seller with respect to the fact that the underlying title defect. But as to a duty to defend, and that's what we're talking about here, is if all it's seeking is monetary damages, by definition, they're not attacking the validity of the mortgage. So that's why it was critical when we reviewed the Fourth Amendment complaint that the fourth count specifically included quiet title relief versus the first two counts did not. Lastly, and I'll be very brief, counsel talks about the fact that how it's not feasible to have a situation where a lender's counsel and counsel appointed by the title company work together and drives up the cost. I would respectfully submit that, number one, that happens all the time. I've been involved in many cases like that. But more importantly, in this particular case, it shows how feasible it is. Because remember what happened here. With respect to the Fourth Amendment complaint, steward title retained Mr. Rothman to represent Ocwen as to that claim. Counsel jointly deposed Mr. Alupu. Mr. Messenger took the lead in that deposition. Mr. Rothman also participated as did I. And then they prosecuted jointly a motion for summary judgment and prevailed before the district court. So to suggest that it's not a feasible arrangement is belied by the very outcome in this case. Thank you. We would like to get a transcript of the argument, and we can check with Mr. Williams and he can tell us how to use the transcript. Thank you. Thank you. Well done, both of you. I take the matter into advisement. And the next matter is.